**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| Panduit Corp., | |
| Panduit, | |
| v. | Case No. 5:18-CV-00229-FL |
| Corning Incorporated | |
| Defendant, | |

**CORNING'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION TO FIND THE CASE EXCEPTIONAL AND AWARD FEES</u>**

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**.................................................................................................... 1

**BACKGROUND** .................................................................................................... 2

    A.    Panduit Knew From the Beginning that Corning Did Not Infringe....................... 2

    B.    Having No Infringement Theory, Panduit Embarked on a Fishing
Expedition In Hopes of Finding One ...................................................... 5

    C.    Having Lost Its Motion to Add New Patents, Panduit Tried to Use the Claim
Construction Process to Rewrite Its Asserted Claims............................................ 7

    D.    Despite Knowing It Had No Case, Panduit Continued to Seek Discovery,
and Even Asked the Court for a Default Judgment ................................ 9

**LEGAL STANDARDS** ........................................................................................ **9**

    A.    Awarding Attorney Fees In Exceptional Cases Under 35 U.S.C. § 285 ............... 9

**ARGUMENT** ...................................................................................................... **10**

    A.    This Case Is Exceptional and Fees Are Appropriate Under 35 U.S.C. § 285
.................................................................................................... 10

    B.    Awarding Corning Its Attorney Fees Is Appropriate Under 35 U.S.C § 285....... 17

**CONCLUSION** ................................................................................................... **18**

# INTRODUCTION

Panduit's case has never been about the merits of its infringement claims. Filed five days after Panduit suffered an early loss in another patent infringement action that was filed by Corning,[1] this case was and always has been a failed attempt by Panduit to gain leverage against Corning in response to Corning's patent infringement suits against Panduit. As a result, Panduit kept this case alive for years in the face of concrete evidence proving that Corning's accused fiber selection process does not infringe Panduit's asserted patents.

Faced with that evidence, Panduit has had many opportunities to be reasonable and dismiss its case. Each time, Panduit refused. At one point, realizing it needed to completely overhaul its case to continue, Panduit tried to inject new patents into the case despite having just as little basis to believe those patents were infringed. After the Court denied that request, Panduit embarked on a discovery fishing expedition hoping to find something—anything—upon which to form a new infringement theory. That failed too. Both gambits did, however, drive up legal costs and disrupt Corning's business. Not to be deterred, Panduit attempted to salvage its original case by rewriting the asserted claims in a transparent attempt to reverse engineer coverage over Corning's processes. But as this Court held, Panduit's claim construction positions defied both "logic and grammar."

Stumped by the record that did not support its claims, Panduit took yet another unreasonable litigation position—a last-minute argument that it was entitled to an adverse inference of infringement because Corning allegedly did not produce what Panduit deemed to be sufficient documentation quickly enough in discovery. Knowing that it had no chance of winning on the merits, Panduit asked this Court to grant it a win anyway. But this was also a dead end for

---

[1]     *Panduit Corp. v. CCS Tech., Inc.*, IPR2016-01647, -01648, Paper No. 27 (P.T.A.B. Feb. 2, 2018); *Corning Optical Comms. LLC v. Panduit Corp.*, No. 1:16-cv-00268-CFC (D. Del. 2016).

1

Panduit, with a finding from the Court that Corning was indeed cooperating in the discovery process. Panduit has now filed a notice to appeal the issued claim constructions despite having never articulated any plausible infringement theory even under its own proposed claim constructions. But the Court's *Markman* Order was well-reasoned and careful, and Panduit will find no more success elsewhere than it has here. Corning will nonetheless be forced to continue to spend money and resources on this frivolous case.

Panduit's persistently unreasonable positions and conduct evidence the exceptional nature of this case. Because this case "stands out from others," an Order finding the case exceptional and awarding attorney fees under 35 U.S.C. § 285 is warranted.

## BACKGROUND

### A. Panduit Knew From the Beginning that Corning Did Not Infringe

#### 1. Corning's Standard Operating Procedure, Provided to Panduit Within Weeks of the Complaint, Proved Corning Did Not Infringe

Panduit—an established industry participant and no stranger to patent-infringement litigation—filed this case nearly four years ago, accusing Corning of infringing the Asserted Patents. D.E. 1. The asserted claims recite "a three-step method for selecting optical fiber: 1) fiber is measured at two different locations in a certain way, 2) those two measurements are subtracted, and 3) the fiber is chosen if the result of that subtraction is a negative number." D.E. 109 (sealed) at 4. In the complaint, Panduit did not identify any Corning activity that allegedly infringed. Panduit asserted "on information and belief" that some unspecified Corning activity "use[s] methods that infringe." *See* D.E. 1 ¶ 26.

Shortly thereafter, Corning wrote to inform Panduit that its complaint was wholly conclusory and failed to identify any Corning activity that allegedly practices the claimed methods. Ex. 1 (April 3, 2018 letter). Panduit responded by saying that Corning's allegedly "infringing

conduct" was its "selecting [OM4+] fiber using the patented methods." Ex. 2 (April 13, 2018 letter). Corning told Panduit that this identified nothing and failed to place Corning on notice. D.E. 82-3 (April 16, 2018 letter (sealed)). In response, Panduit took the position that Corning must be infringing because "Corning's fiber systematically . . . exhibits a negative p-shift." Ex. 3 (April 18, 2018 letter). Though Panduit had failed to identify any allegedly infringing activity, Corning nonetheless—prior to discovery—voluntarily provided Panduit and its expert with Corning's highly confidential standard operating procedure (SOP) describing in detail the steps Corning performs to select and categorize fiber. Ex. 4 (April 20, 2018 letter). This meritless litigation should have ended then and there. However, Panduit refused. As the SOP shows, Corning uses an industry standard process that pre-dates Panduit's patent claims ("minEMBc"), so there is no way Corning could infringe. Ex. 5 (SOP). Indeed, Panduit eventually admitted that this prior art minEMBc process does not fall within the scope of the asserted claims. D.E. 141-5 (Pl. Resp. to RFA No. 5) at 3.

On May 2, 2018, Panduit refused to withdraw its complaint despite having reviewed Corning's fulsome proffer because, according to Panduit, Corning's SOP "does not explain why Corning's fiber systematically (*i.e.*, in all 12 fibers in a cable) exhibits a negative p-shift or negative relative delay." D.E. 75-1 (May 2, 2018 email (sealed)) at 3. The very next day, Corning provided an explanation—supported by produced DMD data—and suggested that Panduit test additional fiber to verify for itself. *Id.* at 2 (May 3, 2018 email (sealed)), 9–10 (attached DMD data (sealed)). Panduit was not interested. Instead, Panduit claimed that it was not "persuade[d]" by Corning's explanation and data. Ex. 6 (May 8, 2018 email). It did not wish to test additional OM4+ fiber. *Id.* Rather, it was somehow more convinced that Corning infringed, and believed that the "only" path forward was "through continuing with the pending litigation." *Id.* Corning again urged Panduit to

3

dismiss its case in the face of the overwhelming evidence of non-infringement. Ex. 7 (May 10, 2018 letter). On May 14, 2018, Panduit again refused and rejected Corning's offer to test additional OM4+ fiber. Ex. 8 (May 14, 2018 letter) at 2.

To be sure, by May 2018, Corning had provided Panduit with evidence and explanation showing that Corning definitively does not infringe Panduit's Asserted Patents, including the SOP and numerous examples of Corning's accused fiber not having the characteristics—negative DMD slopes—necessary to show infringement. *See* Ex. 7. But Panduit still refused to withdraw its complaint, forcing Corning to move to dismiss (D.E. 23, 24), which the Court granted on January 14, 2019 (D.E. 36).

### 2. Panduit Knew That The Data It Relied On To Survive Dismissal Was Not Representative of Corning's Accused Products

Panduit then filed a first amended complaint on February 4, 2019. In doing so, Panduit alleged that Corning's OM4+ fibers "systematically exhibited a negative DMD Shift," and that "the only way to achieve the systematic exhibition of a negative DMD Shift" was to "select[ ] fibers according to the methods claimed and described" in the Asserted Patents. D.E. 43 ¶¶ 56–67. But these allegations, which allowed Panduit to survive a second motion to dismiss, were not true, and Panduit knew it. Panduit's allegation that Corning's OM4+ fibers "systematically" exhibited a negative DMD shift was based on testing Panduit performed on *a single Corning cable*. D.E. 82 (sealed) at 2; D.E. 82-4 (May 3, 2018 email (sealed)) at 1.

As Corning explained to Panduit nearly a year before Panduit filed the amended complaint, Corning's OM4+ fiber is not "systematically" negative DMD shifted. *Id.* Corning explained that, because Panduit only tested a single cable, it was unsurprising that all 12 of the fibers in that cable would have similar optical properties. *Id.* Corning also explained that, in general, only about half of its OM4+ fibers have a negative shift, which is true. *Id.* In March 2019, Corning again explained

this to Panduit, provided an explanation of how it differentiates its various OM4 products in response to Panduit's request, and offered to provide yet more OM4+ samples. Ex. 9 (March 21, 2019 letter). Even in the face of Corning's evidence and explanation to the contrary, Panduit again refused to concede or even confirm whether its infringement theory was viable.

It was not until almost a year later that Panduit performed its due diligence. And, just as Corning had explained, the outcome showed Corning's fibers were not "systematically" negative shifted. On March 17, 2020, Panduit informed Corning of Panduit's test results for Corning's product samples: two of the three cables did not have all negative shifted fiber as Panduit had previously believed. D.E. 82-6 (March 17, 2020 email (sealed)) at 1. Remarkably, Panduit still refused to be reasonable, and pressed forward with this litigation.

In the summer of 2020, in response to Panduit's demand, Corning provided Panduit with even more technical documentation, which further confirmed that Corning did not perform Panduit's patented methods. On July 6, 2020, Panduit finally ***admitted*** that Corning's minEMBc method does not infringe the Asserted Patents. D.E. 141-5 at 3.

**B.    Having No Infringement Theory, Panduit Embarked on a Fishing Expedition In Hopes of Finding One**

Having no viable case, Panduit filed a second motion to amend. This time, Panduit tried to add four new patents related to fiber manufacture. D.E. 82 at 6. But similar to its prior complaints, Panduit provided only conclusory infringement allegations and did not point to any specific aspects of Corning's processes as infringing. *Id.* at 6–7. In its desperate attempt to find a viable path forward, Panduit cherry picked the data—which this Court recognized was "selective[ly] cit[ed]"––in hopes of convincing the Court to allow amendment. D.E. 109 at 22, n.22.

Not surprisingly, on May 3, 2021, the Court denied Panduit's motion. In doing so, the Court noted Panduit's incomprehensible infringement theory, and described Panduit's

5

infringement charts as "unnecessarily repetitive and often conclusory." *Id.* at 15–16 ("[T]he claim charts are conclusory in their explanation of the relation of [Corning engineer and 30(b)(6) witness] Garner's testimony to the claims of the patents-in-suit and the patents to be added.").

Despite losing its motion to amend and add fiber-manufacturing-related patents, Panduit again did not act reasonably and concede. Rather, hoping it could find something else to accuse of infringement, Panduit continued on a discovery fishing expedition, seeking documents on how Corning manufactures, designs, develops, and verifies its fiber—steps clearly not included in the patented methods. D.E. 102 at 3–4. To convince the Court that its requests were limited in scope, Panduit argued that it was not seeking discovery on "all uses of DMD" at Corning, only "uses of DMD shift and its equivalents." D.E. 137 (sealed) at 6.[2] Finding that fiber manufacturing, though not "the core of the patent claims," fell under the "broad . . . scope" of discovery, the Magistrate required Corning to provide this information. D.E. 118 (sealed) at 4. And Corning did. *See* D.E. 152 at 3.

Even after providing the additional discovery to Panduit, in August 2021, three and a half years into this litigation, Panduit still was not able to put Corning on notice as to what precisely was being accused of infringement. D.E. 131-15 (Aug. 12, 2021 letter (sealed)) at 3–4. Remarkably, the operative complaint indicated that Panduit was accusing Corning's categorization of fiber based on its minEMBc classification as "OM4+," yet Panduit had admitted the minEMBc method did not infringe. *Compare* D.E. 43 ¶ 39 *with* D.E. 141-5 at 3.

Unable to articulate an infringement theory, Panduit wanted more discovery. D.E. 141-5 at 1–3. But this approach turns patent litigation procedure on its head—Panduit should have

---

[2]    Panduit later contradicted this position by arguing that it was entitled to discovery on not just DMD shift use but also on practically every aspect of all Corning fiber manufacturing processes. D.E. 137 at 4.

articulated a theory and then asked for discovery on it, not first go fishing around in the hopes of finding one. Though Panduit's fishing expedition uncovered no evidence of infringement, Panduit continued to hint at, but never fully commit to, several other meritless infringement theories. For example, despite refusing to confirm whether Panduit believed that Corning's Q Compensation process infringed the asserted patents, Panduit characterized that process as "relevant to the claims and defenses in this case." D.E. 131 (sealed) at 2 (Aug. 26, 2021). And then on October 7, 2021, Panduit sent Corning a 12-page letter that suggested Panduit believed that Corning's "Slow Feedback" process might infringe. Ex. 10 (Oct. 7, 2021 letter) at 2, 3, 5, 8 (specifically requesting "Slow Feedback" documents).

After multiple requests from Corning over many years, Panduit finally supplemented its infringement contentions on August 31, 2021. D.E. 140-1 (sealed); D.E. 140-2 (sealed). These contentions, however, did nothing more than recycle the language of the claims with a conclusory assertion that an unidentified Corning activity performs each step. *See* D.E. 140 at 6; D.E. 140-1; D.E. 140-2. Nowhere in the contentions could Panduit identify where Corning's activity meets even the most basic claim elements: where are the two measurements, where is the subtraction of those measurements, and where is the determination if the result is negative? D.E. 140 at 5–9. After years of discovery into Corning's fiber classification, testing, and manufacturing processes, Panduit was still unable to even identify what process it was accusing, never mind explain how it infringed. *Id.*

### C. Having Lost Its Motion to Add New Patents, Panduit Tried to Use the Claim Construction Process to Rewrite Its Asserted Claims

Unable to find a way to accuse Corning of infringing the asserted claims as written, or add patents related to manufacturing fiber, Panduit tried to use the claim construction process as a means to wholesale rewrite the language of its asserted claims and expand the scope of its case.

The plain language of the claims, logic, and common sense, require that the asserted method steps be performed in the recited order. As Corning explained, the three steps build upon themselves: the first step requires taking two measurements of a fiber, the second step requires subtracting one of those measurements from the other, and the third step requires choosing a fiber based on the result of that subtraction. Yet, Panduit tried to argue that these three steps could be performed out of order. The fallacy of Panduit's argument was evident during the July 1, 2021 claim construction hearing when the Court asked Panduit whether performing the third step (choosing a fiber based on the result of the subtraction step) would be "based on a guess or a theory, or based on a hope or a prayer" if it were performed out of order. D.E. 125 at 33:15-16.

Panduit's counsel "conceded at [the] hearing that the measuring . . . step could not be performed before the subtracting step." D.E. 144 at 5. In its September 27, 2021 *Markman* Order, the Court agreed with Corning that "logic ***demands***" that the steps of the method claims "must be performed in the order written." D.E. 144 at 4–7 (emphasis added).

The parties also disputed the scope of the term "***choosing*** for use in a communications network." While Corning's proposed construction stayed true to the claim language, Panduit tried to broaden the scope of this term to mean essentially anything under the sun: ***selecting*** optical fiber, ***sorting*** optical fiber, ***designing*** optical fiber, or ***verifying*** optical fiber. D.E. 61-1 at 11–12. Remarkably, Panduit tried to expand the scope of this term even more at the claim construction hearing by arguing that "choosing for use" could also include "***scrapping***" (i.e., choosing ***not*** to use) the fiber, ***selling*** the fiber, or altering the ***manufacture*** of a ***different*** fiber. D.E. 144 at 13–14 (citing D.E. 125 at 47:16–48:7). Panduit's attempt to wholesale rewrite the claim language in the hopes that something Corning does would then fall under their scope failed, as it should. Again, the Court found that Panduit's proposed construction "would expand the scope of the patent

beyond what the claim of the patent defining the invention gives it the right to exclude." D.E. 144 at 12–19.

### D. Despite Knowing It Had No Case, Panduit Continued to Seek Discovery, and Even Asked the Court for a Default Judgment

On October 12, 2021, more than two weeks after the Court's *Markman* Order, Panduit went forward with a hearing on its motion for sanctions. Knowing full well that it had no infringement theory, Panduit continued to maintain that it had an unwavering belief that Corning infringed its patents; Panduit simply needed more discovery from Corning to prove it. *See* D.E. 131 at 8–9. Instead of admitting what it already knew—that Corning does not infringe—Panduit threw mud at Corning and even argued that the Court should grant an unreasonable and unwarranted adverse inference that Corning infringes. *Id.* at 9–10. To be clear, Panduit tried to convince this Court of a finding of infringement ***knowing full well that Corning could not legitimately infringe the claims***. As with its claim construction positions, this argument was based on nothing more than Panduit's "hope [and] prayer." *See* D.E. 125 at 33:15–16.

And then, just two days after that hearing, Panduit presented a stipulation of no infringement to Corning. Not surprisingly, Panduit's motion for sanctions and request for an adverse inference were denied (D.E. 152), and the parties filed the joint stipulation of no infringement on November 2, 2021 (D.E. 153). The Court issued final judgment in favor of Corning as the prevailing party on November 10, 2021. D.E. 160.

## LEGAL STANDARDS

### A. Awarding Attorney Fees In Exceptional Cases Under 35 U.S.C. § 285

Section 285 of the Patent Act allows the Court to award attorney fees to the prevailing party in "exceptional cases." 35 U.S.C. § 285. The Supreme Court has held that a case is exceptional when it "stands out from others with respect to the substantive strength of a party's

litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* Factors that indicate unreasonable litigation conduct include "frivolousness, motivation, objective unreasonableness, and the need for deterrence." *VOIT Techs., LLC v. Del-Ton, Inc.*, No. 5:17-CV-259-BO, 2018 WL 3732671 (E.D.N.C. Aug. 6, 2018) (citing *Octane Fitness* and awarding fees where plaintiff "was unable to explain" fundamental aspects of its infringement theory). The prevailing party need only show entitlement to attorney fees by a preponderance of the evidence. *Octane*, 134 S. Ct. at 1758.

## ARGUMENT

### A. This Case Is Exceptional and Fees Are Appropriate Under 35 U.S.C. § 285

#### 1. Panduit Knew From the Beginning That Corning Did Not Infringe, Yet Unreasonably Persisted With the Case

In bringing and maintaining a claim of patent infringement, a patent owner's infringement allegations must have "evidentiary support" or "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). Just two months after Panduit filed its original complaint accusing Corning's OM4+ categorization process, Corning had provided Panduit with information showing the exact steps that Corning performs to categorize fiber as "OM4+." Ex. 4. This information showed that, in selecting fiber, Corning performs an industry standard, prior art process of determining the minEMBc. Ex. 5. From then, it was objectively unreasonable for Panduit to move forward with its claims knowing this case-dispositive information.

10

But it was years of litigation and expense before Panduit admitted the minEMBc process ***does not*** fall within the scope of the Asserted Patents. D.E. 141-5 at 3. Panduit carried on using this case as a discovery fishing expedition in the hopes it would find something to accuse Corning of infringing its patents. But as this Court recognized, the broad scope of discovery does not affect the reasonable scope of the asserted claims (D.E. 125 at 54:13–19), and it should not have been used by Panduit as a fishing license. Corning was transparent and vocal from the beginning about its non-infringing process. But Panduit persisted with this litigation for more than three and a half years despite having ***no evidentiary support*** for its infringement claims at any point in time.

Cases have been found exceptional when a patent owner unreasonably persists after discovering and acknowledging that the accused instrumentality does not infringe. In *Automated Bus. Cos., Inc. v. NEC Am., Inc.*, the patent owner admitted that the accused product did not infringe after a physical demonstration proved that a key element of the asserted claims was missing. No. 4:98-CV-619, Dkt. 26 at 4–5 (N.D. Tex. Feb. 8, 1999) (attached as Ex. 11). Despite this admission, however, the patent owner refused to dismiss the case and attempted to seek discovery into whether other of the defendant's products might infringe. *Id.* at 5–6 ("Plaintiff did not oppose the dismissal of its claims as to those products. Plaintiff nevertheless urged the court that the action should be maintained on its docket in order that Plaintiff might engage in a fishing expedition to determine whether any other NEC product might infringe its patent."). The district court shut down this "fishing expedition" and determined that the patent owner's litigation misconduct in continuing a case without merit rendered the case exceptional under Section 285 and warranted full attorney fees. *Id.* at 10–11. "Exceptional cases include those where a patentee continued a lawsuit even though it knew that the accused device did not infringe its patent." *Id.* at 10 (citing *Hughes v. Novi Am., Inc.*, 724 F.2d 122, 124–25 (Fed. Cir. 1984)). The Federal Circuit

affirmed the fee award on appeal. *Automated Bus. Cos., Inc. v. NEC Am., Inc.*, 202 F.3d 1353, 1356 (Fed. Cir. 2000).

The exceptional nature of this case is stronger than it was in *Automated Bus. Cos.*. Panduit admitted in July 2020 that Corning's use of minEMBc—the only identified accused process in any of Panduit's complaints—did not infringe, but then proceeded to aggressively demand (and obtain) discovery from Corning *for the next year and a half*. This discovery included depositions of several Corning engineers and 30(b)(6) witnesses, access to Corning's source code, millions of Corning's historical measurements, hundreds of thousands of Corning's minEMBc calculated values, and sworn declarations by Corning's engineers and outside counsel attesting to the thoroughness of Corning's production. *See* D.E. 137 at 1–7. Panduit's litigation activity was objectively unreasonable.

### 2. Panduit's Infringement Allegations Have Been an Objectively Unreasonable Moving Target

In each of its complaints as well as the various versions of its infringement contentions, Panduit failed to tie any Corning activity to any steps of the asserted patent claims—leaving Corning in the dark as to what precise activity Panduit was accusing of infringement. As the Court recognized, Panduit's infringement contentions were "unnecessarily repetitive and often conclusory" and failed to link the Asserted Claims' elements to any Corning instrumentality. D.E. 109 at 15–16; *see also* D.E. 142, 143. In this way, and as shown in the chart below, Panduit's infringement allegations have been a moving target. Despite Corning's repeated requests, Panduit refused to confirm what it was accusing. D.E. 131-15 at 3–4. Indeed, throughout the entire course of this years-long litigation charade, each iteration of Panduit's contentions did nothing more than allege in conclusory fashion that Corning practices the claims. D.E. 36; D.E. 109; D.E. 143.

12

| Date | Source | Panduit's Apparent Theory |
|---|---|---|
| Feb. 2018 | Original Complaint | An unspecified Corning OM4+ process infringes. D.E. 1. |
| Feb. 2019 | First Amended Complaint | Corning infringes because its OM4+ fiber "systematically exhibited a negative DMD Shift." D.E. 43 ¶¶ 56–67. |
| Jun. 2020 | Joint Claim Construction Statement | Corning infringes by performing the three claimed method steps out of order when "selecting," "sorting," or "designing optical fiber," or by "verifying optical fiber performance, including for the purpose of designing or selecting optical fiber cables." D.E. 61-1. |
| Jul. 2020 | Panduit's Response to Corning Requests for Admission | Panduit admits Corning's use of minEMBc to categorize its OM4+ fiber does not infringe. D.E. 141-5 at 3. |
| Sept. 2020 | Proposed Second Amended Complaint | OM4+ no longer accused (all mentions of "OM4+" removed); an unidentified Corning activity infringes based on "[t]he evidence presently known to Panduit," but "[a]dditional discovery is required to further confirm and demonstrate Corning's infringement." D.E. 71-1 ¶¶ 37–38. Corning infringes four new patents related to fiber manufacturing. *Id.* ¶¶ 39–42. |
| Nov. 2020 | Panduit Letter to Corning | Corning's "'Q Compensation' presentation confirms Corning's use of the slope (*i.e.* p-shift) of DMD plots during the designing, manufacturing, selecting, sorting and verifying its MMF…." D.E. 102-13 (sealed) at 1, n.1. |
| Feb. 2021 | Hearing on Panduit's Motion to Compel | "Corning's DMD shift fiber and DMD shift processes" and any equivalents allegedly infringe. Ex. 2 to D.E. 137 at 38:10–15; *see also id.* at 25:15–21, 26:24–27:2, 38:21–24, 40:5–8, 42:23–43:4, 44:2–5 (all same). |
| Aug. 2021 | Panduit's Motion for Sanctions | An unspecified aspect of "Corning's fiber manufacturing processes" infringes. D.E. 131 at 2. |
| Oct. 2021 | Panduit Letter to Corning; Hearing on Panduit's Motion for Sanctions | Corning's "Slow Feedback" process, which has not been used since at least as early as 2017 (*see* Ex. 12 (09/28/2021 Bickham Dep. Tr. at 132:9–136:8), infringes. Ex. 10 at 2, 3, 5, 8. |

Under Federal Circuit precedent, Panduit's constantly changing theories and failure to ever

specifically identify the accused functionality justifies a finding that this case is exceptional. For

example, in *Oplus Techs., Ltd. v. Vizio, Inc.*, the Federal Circuit vacated the district court's denial of fees where "[Plaintiff's] litigation positions, expert positions, and infringement contentions were a constantly moving target, 'a frustrating game of Whac-A-Mole throughout the litigation.'" 782 F.3d 1371, 1374 (Fed. Cir. 2015). As the Federal Circuit recognized, "[d]efending against a constantly moving target would logically have increased the expense of litigation for [defendant]." *Id.* Indeed, this Court awarded attorney fees under § 285 where a patent owner "litigated th[e] case in an unreasonable manner" by being "unable to explain" "foundational" aspects of its infringement theory. *VOIT Techs*, 2018 WL 3732671, at *1–*2.

This case is also similar to *Homeland Housewares, LLC v. Sorensen Research and Development Trust*, 581 F. App'x. 877 (Fed. Cir. 2014). There, the Federal Circuit affirmed an award of attorney fees where, despite "more than a year of opportunities to take discovery and run tests," the patent owner "had presented no evidence whatsoever and had not even suggested what type of evidence it might present" to support its infringement theory. *Id.* at 881. Noting that the patent owner's right to "vigorous enforcement" of its patents "cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith," the Federal Circuit affirmed the trial court's exceptionality finding "based on [Plaintiff's] failure to produce admissible evidence of infringement, as well as [Plaintiff]'s overall conduct during the litigation." *Id.* (internal citation omitted). Here, Panduit had three and a half years of discovery to develop its case. Yet, at no point did Panduit ever articulate a viable infringement theory, let alone produce any evidence of infringement.

### 3. Panduit's Claim Construction Positions Were Illogical and Unreasonable

After realizing it did not have a legitimate infringement theory under the asserted claims, Panduit tried to leverage the claim construction process to rewrite those claims in an effort to

manufacture a new infringement theory.[3] Instead of following the accepted rules of claim construction, Panduit proposed constructions that flew in the face of established legal precedent, logic, and common sense. *See* D.E. 144. Finding that Panduit's proposed constructions were "in tension with the plain language of the claim" (*id.* at 7), contrary to "logic and grammar" (*id.* at 4), and an attempt to "expand the scope of the patent beyond what the claim of the patent defining the invention gives it the right to exclude" (*id.* at 14, 17–18), the Court rejected them.

"Although reasonable minds can differ on claim construction positions, [Panduit]'s proposed constructions . . . fall below the threshold required to avoid a finding of objective baselessness" and warrant a finding of an exceptional case. *Taurus IP, LLC v. DiamlerChrysler Corp.*, 726 F.3d 1306, 1327 (Fed. Cir. 2013) (affirming exceptional case finding); *see also Icon Health & Fitness, Inc. v. Octane Fitness, LLC*, 112 F. Supp. 3d 888, 893 (D. Minn. 2015) (noting that "Courts have found cases exceptional where patent owners' arguments are inconsistent with the text of their own patent" and awarding fees where patent owner asserted infringement based on an interpretation of a claim "wholly at odds with the text of the" asserted patent). And similar to *Iris Connex, LLC v. Dell, Inc.*, where the court found the case exceptional based in part on patent owner's unsound claim construction positions, here Panduit's proposed constructions were "not only implausible but nonsensical" because they were "completely divorced from the claim language and the specification," they were "an attempt to turn the claim language on its head," and they were unable to be supported by the patent owner's counsel at argument. 235 F. Supp. 3d 826, 846–50 (E.D. Tex. 2017). Panduit's claim construction positions are particularly remarkable in light of the absence of any plausible theory of infringement as discussed above—Panduit simply

---

[3] Even in its attempt to expand the scope of the claim language, Panduit was never able to set forth a theory of infringement or articulate what Corning activity allegedly practiced the claimed methods under its proposed constructions. *See* D.E. 140-1; D.E. 140-2.

tried to broaden its claims as much as possible in the hopes that its discovery fishing expedition would later reveal some Corning process it could shoehorn into them.

### 4. Panduit's Litigation Conduct Has Been Frivolous and Its Motivation Problematic

The procedural context of this case and Panduit's litigation conduct further support a finding of exceptionality. On February 2, 2018, Panduit was in a bad position. It was struggling to defend against Corning's allegations of willful patent infringement in the District of Delaware (*Corning Optical Comms. LLC v. Panduit Corp.*, No. 1:16-cv-00268-CFC (D. Del. 2016)), and the first of many PTAB decisions rejecting Panduit's invalidity attacks against those patents had just issued (*Panduit Corp. v. CCS Tech., Inc.*, IPR2016-01647, -01648, Paper No. 27 (PTAB Feb. 2, 2018)). Appreciating the not-too-remote possibility of being found to infringe Corning's patents and liable for a multimillion-dollar damages award, Panduit needed leverage. So, just five days later and without an infringement theory, Panduit picked two patents from its portfolio and sued Corning.

Over the next several years, Panduit's position went from bad to worse. In mid to late 2019, the Federal Circuit affirmed the PTAB decisions. In early 2020, the ITC instituted an Investigation into whether Panduit's imported high density optical data center equipment infringed several of Corning's patents. *In re Certain High-Density Fiber Optic Equipment and Components Thereof*, 337-TA-1194 (USITC). Time ran out for Panduit on August 3, 2021 when the ITC determined that Panduit had, in fact, infringed three valid Corning patents. The ITC issued a general exclusion order against Panduit's infringing imported products.

After this Court's *Markman* Order issued, Panduit still pushed forward with its meritless claims. Fully understanding and eventually conceding that "Panduit cannot prevail on the issue of infringement" (D.E. 153 ¶ 8), Panduit nevertheless asked this Court two weeks after that Order—

16

at a point when it must have already been planning to seek a stipulation of noninfringement—to award it with an adverse inference that Corning infringed. D.E. 131 at 10; D.E. 147. Knowing it was running out of options, Panduit brazenly pushed forward with its request for sanctions in a last effort to obtain leverage against Corning. Remarkably, two days after that hearing, Panduit suddenly pivoted and presented a stipulation of no infringement to Corning.

This Court and others have awarded attorney fees in cases where a party's "pattern of litigation indicates its motivation is problematic and deterrence is warranted." *VOIT Techs.*, 2018 WL 3732671 at *3; *Iris Connex*, 235 F. Supp. 3d at 849–50 (awarding attorney fees under § 285 in part because the patent owner apparently filed the case for settlement leverage, not to test the merits); *Automated Bus. Cos.*, 202 F.3d at 1355 (Section 285 "serves as a deterrent to improper bringing of clearly unwarranted suits for patent infringement") (citation and quotation marks omitted). "[A] case can [also] be found exceptional when a party prolongs litigation in bad faith." *Taurus IP*, 726 F.3d at 1328.

As this Court has recognized, "[i]t is axiomatic that a Plaintiff should want a case to be heard on its merits. The fact that Plaintiff here clearly did not demonstrates that a fee award is appropriate." *VOIT Techs.*, 2018 WL 3732671, at *1. Such is the case here with Panduit.

**B.      Awarding Corning Its Attorney Fees Is Appropriate Under 35 U.S.C § 285**

The purpose of Section 285 is "to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit." *Central Soya Co., Inc. v. Geo A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). As explained above, this case is exceptional and Corning, as the prevailing party, is entitled to the attorney fees it incurred in this lawsuit in the amount of approximately $2.75 million. Herein, Corning addresses the merits of its request and provides the reasonable estimate as required by Rule 54. Should the Court grant Corning's motion, Corning

will provide a supporting declaration, redacted invoices, and a revised total of its fees consistent therewith.

## **CONCLUSION**

This case stands out from others and thus Corning respectfully requests that the Court enter an Order finding this case exceptional pursuant to 35 U.S.C. § 285, and award Corning its attorney fees.


Date: November 24, 2021

Respectfully submitted,

*/s/Mark T. Calloway*
Mark T. Calloway
N.C. Bar No. 10822
ALSTON & BIRD LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1111
mark.calloway@alston.com

Eric D. Hayes (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel.: (312) 862-2000
eric.hayes@kirkland.com

*Counsel for Defendant Corning Incorporated*

18

## CERTIFICATE OF SERVICE

I certify that, on November 24, 2021, I served this document by filing a true copy through the Court's electronic filing system, which will send notification of the filing to all counsel of record.

*/s/ Mark T. Calloway*
Mark T. Calloway
N.C. Bar No. 10822
ALSTON & BIRD LLP
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1111
mark.calloway@alston.com